| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | **NOT FOR PUBLICATION** |
| REMY CANTAVE,<br><br>      Plaintiff,<br><br>  – against –<br><br>UPTOWN COMMUNICATIONS &<br>ELECTRIC INC., and NELSON<br>FELICIANO, DANNY GREENBERG,<br>ELVIS PEJOVIC, AND JONATHAN<br>SMOKLER, individually and as aiders<br>and abettors,<br><br>      Defendants. | **MEMORANDUM & ORDER**<br><br>14-CV-01838 (ERK) |

KORMAN, *J.*:

## BACKGROUND

Plaintiff Remy Cantave filed this action against his former employer, Uptown Communications & Electric, Inc. ("Uptown"), and individual defendants Nelson Feliciano, Danny Greenberg, and Elvis Pejovic (collectively, "defendants"), alleging violations of unidentified sections of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*; New York Labor Law §§ 193, 198; New York State Executive Law §§ 292, 296; and New York City Administrative Code § 8-107.[1] Specifically, Cantave alleges that Uptown and its management team: (1) violated the terms of the collective bargaining agreement ("CBA") governing his employment by paying him reduced wages; and (2) discriminated against him on the basis of his race and national origin by underpaying him, giving him less favorable assignments than employees outside of his protected class, denying him annual pay raises, prohibiting him from

---

[1] Cantave initially also filed retaliation claims pursuant to 29 U.S.C. § 218c and New York City Administrative Code § 6-109, as well as claims against individual defendant Jonathan Smokler. ECF No. 1 at 8–10. He "voluntarily discontinues" these claims in his reply brief. Pl.'s Opp'n Br. 2, ECF No. 21-8.

taking vacations, and terminating him despite his unofficial status of "medical leave." Defendants now move for summary judgment. *See* ECF No. 20.

**FACTS**

**1. Wages**

Uptown is a contractor engaged by Time Warner Cable to install cable and high speed internet ("HSI") in the homes of subscribers. Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶ 1, ECF No. 20-2. Cantave testified that he "probably" first started working for Uptown Communications in 2004, and then briefly worked for Cablevision before returning to Uptown as an installation technician in 2005 or "right at the beginning of" 2006. Cantave Dep. 12:9–13, 15:21–24, 31:5–11, ECF No. 21-6 at 4–6. He was subject to a CBA with an effective date of April 1, 2007. Defs.' 56.1 ¶ 9. Neither the complaint nor any of the parties' briefings refer to an earlier CBA.

The CBA is the only basis for determining an Uptown technician's pay. Pejovic Dep. 13:5–9, ECF No. 21-6 at 40; Feliciano Dep. 13:3–8, ECF No. 21-6 at 46. The CBA included a wage schedule, which provided in relevant part:

> 1. All new employees may be hired at a minimum rate of $9.00 per hour . . . . All employees with two (2) years of service or more shall receive a minimum hourly rate of $11.50 per hour . . . .
>
> 7. All A+ work will be performed at minimum [sic] of $15.68 per hour plus contractual increases for employees hired before April 1, 2007. If a technician is certified as A+, his/her minimum salary whether doing A+ work or not will be $13.58 an hour plus contractual increases per year . . . .
>
> 8. All existing technicians hired before April 1, 2007 who are not A+ certified and not performing modem work will receive the Premium rate of $15.00 per hour plus the contractual increases if they become qualified to perform modem work.

2

Decl. Supp. Mot. Summ. J. Ex. C ("CBA") at 67–68, ECF No. 20-5. Cantave alleges in his complaint that he "started at $8.00 per hour," which is "below the minimum wage." Compl. ¶¶ 22, 31, 41, ECF No. 1. He further alleges that, "despite many complaints to supervisors, [his salary] reached a high of $13.39 per hour in 2010," which is less than the rate to which he claims to have been entitled under the CBA. *Id.*

The parties agree that "A+ certification," which is not defined in the CBA, "means a technician has obtained a certification necessary to manage, troubleshoot, or configure computers," and that the purpose of obtaining this certification is to earn a higher pay rate under the CBA. Pl.'s Rule 56.1 Statement ("Pl.'s 56.1") ¶¶ 10, 12. Cantave concedes that he was not A+ certified, and was therefore subject to paragraph eight of the CBA. *See id.* at ¶ 11. The parties dispute, however, the meaning of the phrase "bec[o]me qualified to perform modem work" in paragraph eight, and whether Cantave satisfied that requirement. *See id.* at ¶¶ 11, 17. In particular, they contest: (1) whether Cantave was performing HSI installations; (2) whether HSI installations constitute "modem work" within the meaning of the CBA; and (3) even if Cantave was performing HSI installations, and HSI installations do constitute "modem work," whether he was "qualified" to do those installations without having received an A+ certification.[2]

2. **Discrimination**

Defendant Greenberg is one of the co-owners of Uptown, Def.'s 56.1 ¶ 2; Defendant Feliciano was the company's General Manager, *id.* at ¶ 6; and Defendant Pejovic was Cantave's

---

[2] Defendants concede in a footnote that "HS[I] work is modem work," Def's Mem. Supp. Mot. Summ. J. 4 n.2, ECF No. 20-19, and Cantave alleges that he regularly installed HSI, *see* Pl.'s 56.1 ¶ 11. This would seemingly resolve the first two factual questions on a motion for summary judgment, leaving only the question of whether Cantave was in fact "qualified" to perform those installations despite lacking A+ certification. Nevertheless, Cantave asserts that "HS[I] work is high speed internet work, which Plaintiff was performing, *though he was not performing modem work*." Pl.'s 56.1 ¶ 17 (emphasis added). In addition to undermining Cantave's wage claim, this assertion appears to contradict Cantave's deposition testimony that performing HSI installation requires "bring[ing] in a modem" and then troubleshooting any problems that result. Cantave Dep. 36:2–14, ECF No. 20-3.

3

direct supervisor, *id.* at ¶ 4. Cantave is an African-American male of Haitian national origin. *Id.* at ¶ 3. Feliciano is Latino and of Puerto Rican descent, and Pejovic is White. *Id.* at ¶¶ 5, 7.

Cantave alleges that Pejovic, who was responsible for assigning work, gave more favorable assignments to non-A+ certified technicians with less experience than Cantave. *See* Compl. ¶¶ 18–19; Cantave Dep. 132:4–24, ECF No. 21-6 at 25. He cited one example at his deposition of a Latino technician, whose name Cantave could not remember, who allegedly received higher-paying assignments than Cantave despite the fact that he was more junior. *Id.* Cantave alleges that he repeatedly complained about this practice to defendants. *See, e.g.*, *id.* at 143:21–25, ECF No. 21-6 at 27.

He also alleges in his complaint that "prior to 2008, [he] did not receive pay raises, while similarly-situated co-workers outside Cantave's protected classes received raises at least once a year." Compl. ¶ 20. Moreover, he was "denied the opportunity to take vacations, while similarly-situated co-workers outside Cantave's protected classes were permitted to take their available vacations." *Id.* at ¶ 21.

Cantave was fired in February 2012 for failing to attend work or call to report his absence. *See* Decl. Opp'n Mot. Summ. J. Exs. B & C, ECF Nos. 21-2, 21-3. Cantave alleges that he was recovering from a work-related knee injury, and had informed Pejovic that he would be out for several days for medical reasons. Cantave Dep. 98:11–101:9, ECF No. 21-6 at 12–15. At a meeting with Feliciano, Pejovic, and union representative William Bruno, Cantave was informed that he was being terminated "because . . . I stayed out for too long, and I didn't have no more vacation days, and I didn't call." *Id.* at 107:15–21, 109:5–12, ECF No. 21-6 at 20–21.

3. **Grievance Procedures**

The CBA contained the following provision governing grievances procedures:

4

> All complaints or disputes involving the interpretation or application of this Agreement, or disciplinary penalty (including discharge) must be filed by the grievant within fifteen (15) working days from the occurrence or knowledge of the occurrence. The respondent has five (5) working days to reply. Failure for either side to abide by this time frame shall render either the grievance or the defense null and void. If said grievance cannot be settled directly by the parties it may, upon application by either party, be submitted to the American Arbitration Association for binding arbitration in accordance with its Expedited Arbitration Procedure.

CBA at 65. Cantave does not allege that he utilized these grievance procedures either to challenge what he perceived to be his under-payment or to challenge defendants' allegedly discriminatory behavior.

### 4. Procedural History

Cantave initially filed this lawsuit in New York State Supreme Court (Queens County) in September 2012. Compl. ¶ 10. It was transferred to the Eastern District of New York by joint stipulation of the parties to allow Cantave to raise "his wage and vacation claims under the Collective Bargaining Agreement as federal claims . . . ." *Id.* at ¶12 & Ex. A.

## DISCUSSION

### 1. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted).

## 2. The FLSA and the LMRA

The FLSA, 29 U.S.C. § 201 *et seq.*, and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, reflect "[t]wo aspects of national labor policy." *Barrentine v. Ark.–Best Freight Sys., Inc.*, 450 U.S. 728, 734 (1981). "The LMRA, on one hand, governs the relationships between employers and unions by 'encourag[ing] the negotiation of terms and conditions of employment through the collective-bargaining process.'" *Vadino v. A. Valey Eng'rs*, 903 F.2d 253, 264 (3d Cir. 1990) (quoting *Barrentine*, 4450 U.S. at 734).

> That process . . . consists of the grievance and arbitration procedures and, if necessary, the resort to federal courts via section 301 to resolve disputes between employers and employees over the interpretation and enforcement of the previously negotiated provisions of collective bargaining agreements relating to, *inter alia,* pay and conditions of employment.

*Id.* (citing *Smith v. Evening News Ass'n,* 371 U.S. 195, 200 (1962)). "[C]laims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement,'" are thus governed exclusively by § 301 of the LMRA. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987) (citations omitted).

"The FLSA, on the other hand, is reflective of a different genre of statute, one which 'guarantees covered employees specific substantive rights.'" *Vadino*, 903 F.2d at 264 (quoting *Barrentine,* 450 U.S. at 734). The rights conferred by the FLSA "are independent of contractual rights arising out of a CBA," *Johnson v. D.M. Rothman Co.*, 861 F. Supp. 2d 326, 331 (S.D.N.Y. 2012) (citing *Barrentine,* 450 U.S. at 745), and "[t]he enforcement provision of the FLSA is limited to employee suits seeking enforcement of their rights under the statute." *Vadino*, 903 F.2d at 265 (citing 29 U.S.C. § 216(b)). Thus, "although FLSA . . . claims that 'are truly independent of a [CBA] are enforceable,' the LMRA will preclude such claims that are 'inextricably intertwined' with the terms of a CBA." *Johnson*, 861 F. Supp. 2d at 332 (citing

*Dougherty v. Am. Tel. & Tel. Co.*, 902 F.2d 201, 203–04 (2d Cir. 1990)); *cf. Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220–21 (1985) (holding that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." (citations omitted)).

"The boundary between claims requiring 'interpretation' of a CBA and ones that merely require such an agreement to be 'consulted' is elusive." *Wynn v. AC Rochester*, 273 F.3d 153, 157–58 (2d Cir. 2001). Nevertheless, courts have found federal and state law employment claims to be precluded by § 301 of the LMRA when they "require[] more than 'simple reference to the face of the CBA.'" *Johnson*, 861 F. Supp. 2d at 333 (quoting *Wynn*, 273 F.3d at 158) (concluding that § 301 preempted the plaintiffs' FLSA claims arising from their alleged entitlement under the CBA to wage differentials established for "hi-lo operators" or "grandfathered employees," where the CBA did not define those terms); *see also, e.g.*, *Hoops v. Keyspan Energy*, 822 F. Supp. 2d 301, 306–09 (E.D.N.Y. 2011) (dismissing FLSA claim as premature where the plaintiff's right to receive night shift differentials "hinge[d] on the [CBA]'s definition of the terms of employment" and the plaintiff failed to exhaust his administrative remedies under the CBA); *Salamea v. Macy's E., Inc.*, 426 F. Supp. 2d 149, 154–55 (S.D.N.Y. 2006) (finding that § 301 preempted the plaintiff's state law claims arising from the defendants' alleged failure to pay her for vacation days, because determining whether she was entitled to those vacation days required interpreting the CBA); *Tand v. Solomon Schechter Day Sch. of Nassau Cnty.*, 324 F. Supp. 2d 379, 383 (E.D.N.Y. 2004) (concluding that the plaintiff's claims were preempted because "[i]n order to determine whether there was, in fact, a breach of the

CBA, the Court must determine the 'rights and responsibilities' of the parties under the CBA . . . . [and] interpret certain articles in the CBA . . . .").

### 3. Exhaustion under the LMRA

Before bringing an action pursuant to § 301 of the LMRA, "the employee must exhaust grievance procedures provided by the relevant collective bargaining agreement." *Dougherty*, 902 F.2d at 203 (citing *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 563 (1976)); *accord Vaca v. Sipes,* 386 U.S. 171, 184 (1967). The failure to exhaust will not bar an employee's action only if he "can prove that the union has breached its duty of fair representation in failing to pursue his grievance." *Sanchez v. Local 660, United Workers of Am.*, 25 F. Supp. 3d 261, 267 (E.D.N.Y. 2014) (citations omitted). "In order to be excused from the exhaustion requirement based on a union's breach of the duty of fair representation, the employee must adequately plead and eventually prove that breach, even if only the employer is sued." *Vera v. Saks & Co.,* 424 F. Supp. 2d 694, 705 (S.D.N.Y. 2006) (citations omitted).

### 4. Cantave's FLSA Claims

Cantave does not specify which provision of the FLSA defendants allegedly violated, nor point to any substantive statutory rights that he has been denied. His allegation that the $8.00/hour rate he received when he first started at Uptown was "below the minimum wage" is factually inaccurate, at least to the extent that he refers to the federal minimum wage established by FLSA (which reached its current high of $7.25 in July 2009). *See* Compl. ¶ 31; 29 U.S.C. § 206. While he may have a breach of contract claim if he was receiving less than the $9.00 minimum wage at which "[a]ll new employees *may* be hired" under the CBA, *see* CBA at 67 (emphasis added)—assuming that he was still receiving that rate after the CBA took effect in April 2007—this does not constitute a valid claim under FLSA. Similarly, Cantave's allegation

that he was paid less than the $15.00/hour rate to which he was entitled under paragraph eight of the CBA does not constitute a cognizable claim under FLSA, because he is not "seeking enforcement of [his] rights under the statute." *Vadino*, 903 F.2d at 265 (citing 29 U.S.C. § 216(b)). Rather, he seeks to enforce his rights under the CBA.

Cantave's claims, which turn on the meaning of the phrase "become qualified to perform modem work" under paragraph eight of the CBA, are "intextricably intertwined" with the CBA and thus governed by § 301 of the LMRA. *Doughtery*, 902 F.2d at 204. Cantave has not, however, alleged a violation of § 301. Indeed, his complaint does not reference the LMRA at all. *See generally* Compl., ECF No. 1. Nor has he alleged that he exhausted the grievance procedures established by the CBA as required before bringing a § 301 claim, or that he is entitled to an exemption from the exhaustion requirement because the union "breached its duty of fair representation in failing to pursue his grievance." *Sanchez*, 25 F. Supp. 3d at 267. "He cannot remedy that defect by establishing in the claim brought under . . . the FLSA that which he should have established under section 301 of the LMRA." *Vadino*, 903 F.2d at 266.

Cantave's FLSA claim is preempted by § 301 of the LMRA. Defendants are therefore entitled to summary judgment on that claim as a matter of law.

### 5. Cantave's State Law Claims

Because Cantave's only federal cause of action is dismissed, I decline to exercise supplemental jurisdiction over his remaining state and city claims. *See* 28 U.S.C. 1367(c)(3); *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 304–06 (2d Cir. 2003). The state and city claims are therefore dismissed without prejudice.

9

## CONCLUSION

I grant defendants' motion for summary judgment as to Cantave's claim under the FLSA.

I dismiss the remaining state and city causes of action without prejudice.

**SO ORDERED.**

Brooklyn, New York
August 5, 2015

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge